IN THE CIRCUIT COURT OF THE 17TH
JUDICIAL CIRCUIT IN AND FOR
BROWARD COUNTY, FLORIDA

CASE NO.: _____
DIVISION: _____

CLAYTON BERNHOLTZ, on behalf of
himself and all others similarly situated,

      Plaintiff,

v.

CROSSCOUNTRY MORTGAGE, LLC, and
CLASS VALUATION, LLC

      Defendants.

**CLASS REPRESENTATION**

## COMPLAINT

Plaintiff Clayton Bernholtz, by and through his undersigned counsel, brings this class action on behalf of himself and all others similarly situated against Defendants CrossCountry Mortgage, LLC ("CrossCountry") and Class Valuation, LLC ("Class Valuation") (together, the "Defendants") for breach of contract and violations of the Florida Deceptive and Unfair Trade Practices Act and, in the alternative, for unjust enrichment, and alleges as follows:

## INTRODUCTION

1. This is a class action lawsuit filed to redress injuries that Plaintiff and a class of consumers have suffered, and will continue to suffer, as a result of Defendants' contractual breach and unlawful, unfair, and deceptive practices relating to the "appraisal fees" they charge mortgage borrowers.

2. Buying a home is one of the landmark financial burdens faced by Americans, especially Floridians. People often spend years saving up for a down payment. But a down payment is just one of the up-front costs. People who manage to save up for a down payment and

1

get approved for a mortgage must also pay closing costs. While home prices and interest rates command more attention, closing costs are significant; indeed, a 2021 study "found that nearly 15 percent of lower income homebuyers had closing costs that exceeded the amount of their down payment."[1] Closing costs, "and particularly the costs the lender imposes on the borrower as part of the cost of getting the loan, have recently risen sharply."[2] "From 2021 to 2023, median total loan costs increased by over 36% percent on home purchase loans," increasing the pressure on borrowers' budgets.[3] Certain closing costs are for services that borrowers cannot shop for, and which do not benefit borrowers.[4] Such costs are ripe for exploitation, leading to an unwelcome surprise for borrowers: "closing costs that all too often are full of junk fees."[5]

3.      Defendants, for their part, charge borrowers "appraisal fees" prior to closing that bear no relation to the actual cost of the appraisal service.

4.      Class Valuation is an appraisal management company ("AMC") that serve as intermediary between mortgage lenders and local appraisers. Lenders like CrossCountry set borrowers' "appraisal fees," charge the appraisal fees to the borrowers, and then pass along the appraisal fees to the AMCs. The AMCs, in turn, arrange for an appraiser to conduct the appraisal.

5.      While a borrower may pay an appraisal fee ranging from $450 to over $1,000, the AMCs pay the appraiser only a fraction of this fee, deceptively keeping the remainder for themselves.

---

[1] Julie Margetta Morgan, *Junk Fees Are Driving Up Housing Costs. The CFPB Wants to Hear from You.*, CFPB (Mar. 8, 2024), https://www.consumerfinance.gov/about-us/blog/junk-fees-are-driving-up-housing-costs-the-cfpb-wants-to-hear-from-you/; *see* NUNO MOTA & MARK PALIM, FANNIE MAE, BARRIERS TO ENTRY: CLOSING COSTS FOR FIRST-TIME AND LOW-INCOME HOMEBUYERS (Dec. 2021), https://www.fanniemae.com/media/42286/display.
[2] Request for Information Regarding Fees Imposed in Residential Mortgage Transactions, 89 Fed. Reg. 48,400 (June 6, 2024).
[3] *Id.*
[4] *See id*; *Junk Fees Are Driving Up Housing Costs, supra* note 1.
[5] *Junk Fees Are Driving Up Housing Costs, supra* note 1.

6.      The appraisers, not Defendants, perform the required appraisal. Class Valuation provides no tangible benefit to borrowers in the appraisal process.

7.      Defendants' practices thus cause consumers to dramatically overpay for appraisal services.

8.      Defendants do not disclose the disproportionate fees they charge borrowers like Plaintiff because if Defendants did, borrowers would see that Defendants inflate appraisal costs without providing a discernible benefit to borrowers or appraisers. For example, CrossCountry does not disclose the existence of an AMC, or the fee it receives, in a borrower's loan estimate. In contrast, CrossCountry represents the appraisal fee as going to the appraiser: "We may order an appraisal to determine the property's value and charge you for this appraisal." However, CrossCountry in fact charges for much more than the appraisal.

9.      Defendants' deception is particularly problematic because the typical dynamics of a free market are not present to keep the price competitive. In this context, the lender picks the AMC, and the borrower is stuck to unknowingly pay the AMC the lender contracts with, without the ability to select an AMC or negotiate the AMC's fees.

10.     The only way to make AMCs' fees subject to the healthy pressure of an efficient market is to inform consumers of the details of the AMCs' fees. This would give consumers a chance to demand that lenders compete for the borrower's business by securing more competitive appraisal fees, and the right to demand a fee that corresponds to the actual appraisal work performed.

11.     This competition is not happening now because Defendants obfuscate the excessive portion of appraisal fees the AMCs take for themselves.

12.     As a result of Defendants' contract breach and unlawful, unfair, and deceptive practices, Plaintiff and a class of consumers have suffered, and will continue to suffer, by being required to pay misrepresented, inflated "appraisal fees."

## PARTIES, JURISDICTION AND VENUE

13.     Plaintiff Clayton Bernholtz ("Bernholtz" or "Plaintiff") is domiciled in and is a citizen of Florida.

14.     Defendant CrossCountry is a limited liability company with its principal place of business in Ohio. CrossCountry routinely conducts business in the State of Florida, is registered to do business in the State of Florida, and maintains an office for service of process in Broward County, Florida.

15.     Defendant Class Valuation is a limited liability company with its principal place of business in Michigan. Class Valuation routinely conducts business in the State of Florida, is registered to do business in the State of Florida, and maintains an office for service of process in Broward County, Florida.

16.     This Court has jurisdiction over Defendants because they committed tortious conduct in Florida and caused injuries to Plaintiff in Florida.

17.     Venue is proper under Fla. Stat. § 47.011 because, upon information and belief, Defendants' have offices in the county for purpose of conducting business in the state.

18.     All conditions precedent to the bringing of this action have occurred or Defendants have waived them.

## FACTUAL BACKGROUND

19.     When borrowers apply for home mortgage loans, whether to purchase or refinance, lenders require appraisals.

4

20.     Appraisals are not services that borrowers shop for; instead, lenders like CrossCountry order appraisals and then charge the cost to borrowers. Consequently, appraisal fees are out of borrowers' control: "Home buyers can't shop around for a cheaper home appraisal."[6] The "only way" to avoid an appraisal fee is to "skip the mortgage and pay for the house in cash."[7]

21.     Appraisers must be independent from lenders under federal law. Therefore, the AMCs serve as middlemen.

22.     Class Valuation is a leading appraisal management company in Florida and throughout the United States.

23.     The AMCs provide no benefit to borrowers, and only a limited benefit to lenders like CrossCountry. The AMCs merely protect the lender from allegations that it violated appraiser independence laws like the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010.

24.     The AMCs offer a sweet deal for lenders like CrossCountry: lenders receive liability protection and do nothing to select the appraiser, and the borrower picks up the cost. No law requires lenders to use AMCs to remain independent, yet many lenders have done so to take advantage of the sweetheart deal that AMCs offer them. In fact, multiple lenders have started their own appraisal management companies as corporate subsidiaries to take advantage of their significant, and undisclosed, profitability.

25.     What services the AMCs provide is obscure, to say the least. It is the appraisers—not AMCs or any of their employees—who contact borrowers, schedule appraisals, conduct appraisals, and prepare appraisal reports. The appraiser's work can take significant time and includes traveling to the property to examine it, conducting market research on comparable

---

[6] *How Does a Home Appraisal Work*, QUICKEN LOANS (Mar. 13, 2024), https://www.quickenloans.com/learn/home-appraisal.
[7] *Refinance Appraisal vs. Purchase Appraisal*, ROCKET MORTGAGE (Apr. 5, 2024), https://www.rocketmortgage.com/learn/refinance-appraisal-vs-purchase-appraisal.

properties, and then preparing a final appraisal report. The AMC receives the appraisal report and forwards it to the lender, but beyond that it is unclear what, if any, role AMCs have in supporting the work to create the appraisal report.

26.     Even though the AMCs provide no benefit to borrowers and have no apparent role in the actual appraisal services, the AMCs enrich themselves by obtaining inflated fees that far exceed the actual appraisal cost.

27.     Borrowers like Plaintiff pay appraisal fees that range from $450 to over $1,000 depending on the type of property subject to the appraisal. Mr. Bernholtz paid an appraisal fee of $700 prior to the closing of his loan.

28.     Recent research indicates that appraisal management companies typically retain more than 60% of appraisal fees. In June 2024, the Consumer Financial Protection Bureau (CFPB) requested public comments related to fees charged by providers of mortgages and related settlement services.[8] In August 2024, members of the public submitted comments that described appraisal management companies' deceptive and improper practices, including a report submitted on behalf of the Appraisal Regulation Compliance Council (AARC).[9]

29.     In pertinent part, the research revealed that appraisal management companies retain disproportionate percentages of appraisal fees; in fact, only one of the sample appraisal fees entailed less than 60% going to the appraisal management company.[10] Stated differently, appraisal management companies typically retain more than what they pay appraisers—meaning that borrowers' appraisal fees are typically more than double the actual appraisal cost.

---

[8] Request for Information Regarding Fees Imposed in Residential Mortgage Transactions, 89 Fed. Reg. 48,400 (June 6, 2024).
[9] Docket No. CFPB-2024-0021-0973, https://www.regulations.gov/comment/CFPB-2024-0021-0973.
[10] *Id.*

30.     Borrowers like Plaintiff pay these appraisal fees without the knowledge that the fees go, not to an appraiser, but to the AMC. Plaintiff paid only "appraisal fees" with no indication that the fees were paid to entities that did not conduct the appraisal.

31.     In fact, the AMCs prevent borrowers from discovering the fees the AMCs retain by prohibiting appraisers from disclosing the cost of the appraisal.

32.     Thus, reasonable borrowers are kept in the dark as to the fact that their appraisal fees far exceed the actual appraisal cost.

33.     When borrowers receive a closing disclosure from lenders like CrossCountry (at closing or shortly before), they can see the amount and recipient of their appraisal fee. But the closing disclosure neither informs the borrower that the recipient of the appraisal fee is not an appraiser itself, nor that the recipient retains a significant portion of the fee for itself without performing the actual appraisal work.

34.     Even if the closing disclosure informed the borrower that the appraisal fee far exceeds the actual appraisal cost, such information comes too late. By that point (i.e., at closing or shortly before), the borrower has already chosen a lender like CrossCountry and gone through the application process. For a home purchase, the borrower is also under contract with the seller and has likely paid an earnest money deposit. The borrower cannot realistically go elsewhere; the borrower has no reasonable choice but to pay the misrepresented, inflated appraisal fee. Indeed, it is standard practice to require consumers to pay the appraisal fee before they receive any closing documents at all; therefore, any closing disclosures are largely illusory.

35.     Lenders like CrossCountry have an incentive to hide the true nature of the appraisal fees, as borrowers who are kept in the dark as to how their fees are calculated are unable to demand

that lenders like CrossCountry negotiate with appraisal management companies for more competitive rates or provide alternative means of arranging an appraisal.

36.     In Plaintiff's case, nowhere did CrossCountry disclose the amount of the appraisal fee that the AMC retained as opposed to what the AMC paid the appraisers, or that CrossCountry uses the AMCs for its benefit, not Plaintiff's. Instead, CrossCountry forced Plaintiff to pay an upfront fee of $700, representing that it was charging for only an appraisal, when it categorically was not. Instead, CrossCountry charged Plaintiff an appraisal fee and an undisclosed management fee.

37.     The AMCs likewise have incentives to hide their fees. In the case of Plaintiff and the proposed class, borrowers paid Class Valuation substantially more than the value of their services.

38.     In October of 2025, Plaintiff paid an appraisal fee to CrossCountry for a residential property at 3587 Silver Lace Lane, Boynton Beach, FL, 33445. Before paying the fee, Plaintiff did not receive any disclosures from CrossCountry or Class Valuation as to the existence or role of Class Valuation in his appraisal process, the actual services that Class Valuation performed for Plaintiff, the portion of Plaintiff's payment that went to the appraiser, or the portion of Plaintiff's payment that Class Valuation kept for itself.

39.     CrossCountry's agreement with Plaintiff in his loan estimate simply listed a $700 appraisal fee and stated "[w]e may order an appraisal to determine the property's value and charge you for this appraisal."

40.     Upon information and belief, Class Valuation received this fee and proceeded to retain a significant portion of it for itself, paying the appraiser much less than $700.

41.     Plaintiff paid the $700 fee prior to closing of his loan. At no point did CrossCountry or Class Valuation disclose to Plaintiff the significant fee Class Valuation kept for itself, nor did either Defendant disclose that the cost of the actual appraisal was a fraction of what Plaintiff paid.

42.     It was only after the appraisal was paid for and completed that CrossCountry disclosed to Plaintiff (in a document of closing cost details) that an AMC was involved in the appraisal, and CrossCountry still did not disclose what Class Valuation received from Plaintiff's appraisal fee.

43.     Plaintiff paid for this appraisal while residing in Florida.

44.     Defendants' mandatory, steep, hidden fees for appraisal management services that have no value to the borrower are fraudulent and constitute unfair, deceptive, and coercive business practices. They are also a breach of CrossCountry's contractual promise to only charge Plaintiff an "appraisal fee."

45.     If Defendants disclosed the true nature of their fees and services, reasonable borrowers like Plaintiff could demand more competitive appraisal fees to reflect the actual value of the services provided.

46.     Instead, Defendants have misrepresented and concealed the actual cost of appraisals, misrepresented the services provided in connection with appraisals, and charged borrowers substantially more than the actual cost of their appraisals. Specifically, despite what a reasonable consumer would believe based on the documents and information Defendants provided to Plaintiff and Class Members—that Plaintiff and Class Members' "appraisal fees" were for the actual appraisal services performed by appraisers—Defendants charged Plaintiff and Class Members considerably in excess of the actual appraisal cost, with no tangible benefit to Plaintiff and Class Members. Further, upon information and belief, based on the disproportionate amounts

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY

of appraisal fees that AMCs retain, as demonstrated by research revealing that AMCs typically retain more than 60% of appraisal fees charged to borrowers, the AMCs retained portions of fees for which they did not perform the relevant service.

## CLASS ACTION ALLEGATIONS

47.     Plaintiff brings this action on behalf of himself and on behalf of members of the following classes (the "Classes") under Fla. R. Civ. P. 1.220(b):

**BREACH OF CONTRACT CLASS**

> All Florida citizens who, from October 26, 2021, through and until the date of class certification (the "Class Period"), paid an appraisal fee pursuant to a loan from CrossCountry Mortgage where an AMC received the individuals' appraisal fee. Excluded from the Class are Defendants, their agents, representatives, employees, parent companies, subsidiaries, affiliates, any judge to whom this action is assigned, and any member of that judge's staff and immediate family.

**FDUTPA CLASS**

> All Florida citizens who, from October 26, 2021, through and until the date of class certification (the "Class Period"), paid an appraisal fee—directly or through a lender—for Class Valuation LLC's appraisal management services. Excluded from the Class are Defendants, their agents, representatives, employees, parent companies, subsidiaries, affiliates, any judge to whom this action is assigned, and any member of that judge's staff and immediate family.

48.     Plaintiff reserves the right to amend the Class definition and/or sub-class definitions as discovery proceeds and to conform to the evidence.

49.     While Plaintiff does not know the exact number of members of the Classes, Plaintiff believes there are at least hundreds of members in the Classes. The Classes are so numerous that joinder of all members in this action is impracticable.

50.     Members of the Classes will be ascertainable through Defendants' electronic records, data, and databases.

51.     Plaintiff's claims are typical of the claims that would be asserted by other members of the Classes in that, in proving his claims under Florida law, he will simultaneously prove the claims of all Class Members. The rights afforded under Florida law are the same for Plaintiff and Class Members. Each Class Member had the same interaction with Defendants.

52.     Plaintiff is a Class Member of each proposed class. Plaintiff will fairly and adequately protect and represent the interests of the Classes. Plaintiff's interest is not antagonistic to those of the Classes. Additionally, Plaintiff is cognizant of his responsibility as a Class representative and has retained experienced counsel fully capable of, and intent upon, vigorously pursuing the action. Class counsel have extensive experience in class action litigation.

53.     Questions of law and fact common to the members of the Classes will predominate over questions, if any, that may be individual to individual class members because Defendants have acted and refused to act on grounds generally applicable to the Class.

54.     Questions of law and fact common to the Classes include:

a. Whether CrossCountry Mortgage materially breached its agreement with Plaintiff and Class Members by stating it would only charge for an appraisal "to determine the property's value;"

b. Whether Class Valuation's failure to disclose the fees it retained from Plaintiff and Class Members' appraisal purchases was a deceptive or unfair business practice in violation of FDUTPA;

c. Whether Class Valuation's failure to disclose the fees paid to it by Plaintiff and Class Members' appraisal purchases caused the development of Plaintiff's and the Class Members' appraisal reports by coercion in violation of Fla. Stat. § 475.6245(1)(s);

d. Whether Plaintiff and Class Members conferred a direct benefit on Class Valuation through the payment of appraisal fees;

e. Whether Class Valuation accepted and retained this benefit;

f. Whether the Defendants' conduct caused injury to Plaintiff and Class Members; and

11

g.   The measure of damages sustained by Plaintiff and the Classes.

55.   Class action treatment is the superior method for the fair and efficient adjudication of the controversy in that, among other things, such treatment will permit a large number of similarly situated persons or entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons with a method of obtaining redress for claims that might not be practicable for them to pursue individually, substantially outweigh any difficulties that may arise managing this class action.

## COUNT I

## FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT

### (Against Class Valuation)

56.   Plaintiff incorporates and realleges, as though fully set for herein, each and every allegation set forth in paragraphs 1–55 of this Complaint.

57.   Count I is brought pursuant to the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"). Plaintiff brings Count I individually and on behalf of the Class against Class Valuation.

58.   At all material times, Plaintiff and all members of the class were consumers within the meaning of Section 501.203, Fla. Stat., and are entitled to relief under FDUTPA in accordance with Section 501.211, Fla. Stat.

59.   At all times material, Class Valuation conducted trade and commerce within the meaning of Section 501.203, Fla. Stat.

60.     Class Valuation has engaged in unlawful schemes and courses of conduct through one or more of the unfair and deceptive acts and practices alleged above in an effort to misrepresent and inflate appraisal fees, and to coerce Plaintiff and the Class Members into paying them.

61.     This Defendant has also engaged in per se FDUTPA violations by causing the development of Plaintiff's and the Class Members' appraisal reports through coercion in violation of Fla. Stat. § 475.6245(1)(s).

62.     The misrepresentations, deceptions, concealment, and omissions of material facts alleged in the preceding paragraphs occurred in connection with Class Valuation's trade and commerce in Florida.

63.     Plaintiff's claim under FDUTPA is not related to any advertising or marketing activities conducted by this Defendant. Rather, Plaintiff's claim is solely related to its misrepresentation of the actual costs of Plaintiff's appraisal, misrepresentations of the services it provided in connection with Plaintiff's appraisal, and failures to disclose the fees it paid to Plaintiff's appraiser as part of these transactions.

64.     Class Valuation's unfair and deceptive acts and practices violate FDUTPA, Sections 501.201 and 501.211.

65.     Plaintiff and Class Members suffered injury in fact and lost money as a result of Defendant's unlawful conduct by being required to pay misrepresented, inflated appraisal fees, without any opportunity to avoid such fees.

66.     The FDUTPA violations aggrieved Plaintiff, allowing him to seek injunctive relief on behalf of the Class under FDUTPA.

67.     Plaintiff seeks an injunction prohibiting Class Valuation from continuing to engage in violations of FDUTPA.

13

68.     Plaintiff seeks actual damages pursuant to Section 501.211(2), on behalf of himself and the Class, equal to the amount retained by Defendant above the actual cost of his and each Class Member's appraisal, as well as the costs of suit and attorneys' fees.

## COUNT II

### UNJUST ENRICHMENT

### (Against Class Valuation)

69.     Plaintiff incorporates and realleges, as though fully set for herein, each and every allegation set forth in paragraphs 1–55 of this Complaint.

70.     This is a count for unjust enrichment under Florida law. To the extent necessary, Count II is pled in the alternative to Count I. Plaintiff brings Count II individually and on behalf of the Class against Class Valuation.

71.     Plaintiff and all Class Members conferred a direct benefit on Class Valuation through the payment of funds intended to pay for appraisals of their property, but which were in turn largely retained by the Defendant.

72.     Class Valuation had full knowledge that its receipt of funds bore no connection to the value or cost of the services it provided to Plaintiff and Class Members, and it accepted and retained this benefit for its own use.

73.     Under the circumstances, it would be inequitable to allow the Defendant to retain these benefits.

74.     Class Valuation's actions have caused financial injuries to Plaintiff and Class Members.

## COUNT III

### BREACH OF CONTRACT

### (Against CrossCountry Mortgage)

14

75.     Plaintiff incorporates and realleges, as though fully set for herein, each and every allegation set forth in paragraphs 1–55 of this Complaint.

76.     This is claim for breach of contract under Florida law against CrossCountry.

77.     CrossCountry entered into a loan contract with Plaintiff and Class Members. As part of that contract, CrossCountry agreed that "We may order an appraisal to determine the property's value and charge you for this appraisal."

78.     Therefore, CrossCountry contractually agreed that it would only charge Plaintiff and Class Members for an appraisal to "determine the property's value." Nowhere in Plaintiff or Class Members' contracts (which upon information and belief are identical for the relevant time period) does CrossCountry state that it will charge Plaintiff a management fee for an appraisal management company.

79.     CrossCountry never disclosed in the contract, and neither Plaintiff nor any Class Member agreed to be charged, any management fee unrelated to appraisal work. CrossCountry did not do any work "to determine the property's value," as all of that work was done by the third-party appraiser. As a result, CrossCountry charged Plaintiff and Class Members a fee not permitted in the contract, resulting in a material breach.

80.     By leaving Plaintiff in the dark as to the nature of the appraisal fees, CrossCountry could forgo negotiations with the AMCs and other appraisal management companies to provide more competitive rates or alternative means of obtaining the appraisals.

81.     Plaintiff had no knowledge that when he paid the required appraisal fees, most of the charges were sent to Class Valuation for non-appraisal services unrelated to determining the value of the property.

15

82.     Plaintiff seeks actual damages equal to the amount of the unauthorized fee retained by Class Valuation above the actual cost of his appraisal, as well as the costs of suit and attorneys' fees.

## REQUEST FOR RELIEF

Plaintiff, on behalf of himself and the Classes, respectfully requests the following relief:

a.  Certification of the Classes;

b.  A judgment against Defendants;

c.  Actual damages suffered by Plaintiff and the Classes;

d.  An injunction prohibiting Class Valuation from unfairly and deceptively misrepresenting the nature of its appraisal fees in violation of FDUTPA;

e.  Disgorgement of Defendants' unjust gains;

f.  The costs of suit, including reasonable attorneys' fees and pre-judgment and post-judgment interest as provided by law; and

g.  Such other relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on all claims so triable.

Dated: June 11, 2026

Respectfully submitted,

/s/ Alec H. Schultz
Alec H. Schultz
Fla Bar No. 35022
HILGERS PLLC
1221 Brickell Avenue, Suite 900
Miami, Florida 33131
Telephone: 239-378-7149
Email: aschultz@hilgerslaw.com

*Counsel for Plaintiff and the proposed classes*

16